IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No.  08-36-JJF |
| | : | |
| MICHAEL KING, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF HIS MOTION
TO SUPPRESS EVIDENCE AND STATEMENTS**

Defendant, Michael King, by and through his undersigned counsel, Eleni Kousoulis, Assistant Federal Public Defender, respectfully submits this Memorandum of Law in Support of his Motion to Suppress Evidence And Statements.  For the reasons set forth below, Mr. King seeks to exclude the Government's admission, at trial, of any and all evidence illegally seized by law enforcement officials on or about February 12, 2008, and any alleged statements made by Mr. King subsequent to the illegal search and seizure.

**I. INTRODUCTION**

On March 4, 2008, the Grand Jury for the District of Delaware returned a one-count Indictment against Mr. King, charging him with being a felon in possession of a firearm, in violation of 18 U.S.C. §922(g)(1).  On April 18, 2008, Mr. King filed a Motion to Suppress Physical Evidence and Statements, arguing that law enforcement officials conducted a warrantless search in violation of the Fourth Amendment.  On June 4, 2008, this Court conducted an evidentiary hearing to determine Mr. King's motion.

## II.  PROPOSED FINDINGS OF FACT

At the evidentiary hearing, the Government presented the testimony of Officer Matthew Kucharski and Officer David Hamrick. Mr. King presented the testimony of Agent David Rosenblum, Nicholas Riley and Sean Williams, an Investigator for the Federal Public Defender's Office.  The relevant hearing testimony is summarized as follows.

### A. Officer Matthew Kucharski's Testimony

Officer Matthew Kucharski testified that on the evening of February 12, 2008, he responded to a 911 call concerning a gun complaint at the Bethel Villa Apartments, located at 401 North Pine Street. (Tr. 4).  Upon arrival, Officer Kucharski first encountered a female individual, who told him that she had arrived home that evening and found Mr. King sitting on the stairs and smoking marijuana. (Tr. 4-5, 11).  The woman informed Officer Kucharski that she and Mr. King had been in a verbal altercation, and Mr. King stated "mind your business before I kill you." (Tr. 5).  The woman went to her apartment and closed the door.  (Tr. 5).

Officer Kucharski testified that the woman told him that she heard a knock at her door, at which point she cracked it open and saw Mr. King, who told her "you're going to die," and raised a large handgun. (Tr. 5-6).  The woman informed Officer Kucharski that as she was closing the door, she heard Mr. King run up the stairs.  (Tr. 6).  The woman then opened the door and saw Mr. King run into Apartment C1.  (Tr. 6).

Officer Kucharski and his partner, Officer David Hamrick, proceeded to Apartment C1, with the woman standing behind them, and Ressa Cottingham answered the door.  (Tr. 6, 8, 11, 14). Officer Kucharski testified that he asked Ms. Cottingham if she lived there and was on the lease, and

she replied "yes." (Tr. 6). At that time, Officer Santana arrived at the apartment. (Tr. 12-13).

Officer Kucharski further testified that he asked to speak to Ms. Cottingham about the incident downstairs, and she allowed the officers entry into the apartment. (Tr. 7, 12). The officers observed a small child on the couch in the living room, and asked Ms. Cottingham if anyone else was in the apartment. (Tr. 7, 13). Ms. Cottingham stated that "her boyfriend Michael King was in the apartment," as well as another male friend and several small children. (Tr. 7, 13-14). Officer Kucharski testified that the officers asked to speak to Mr. King, and Ms. Cottingham stated that she would call him. (Tr. 7).

Ms. Cottingham called Mr. King, who exited from a doorway on the left. (Tr. 7-8). The woman who initially contacted the police observed Mr. King and stated, "that's Michael. He's the one that threatened me with a gun." (Tr. 8, 14).

Officer Kucharski testified that he performed a patdown search of Mr. King for safety, and felt what he believed to be a bag of illegal drugs in Mr. King's front right jacket pocket. (Tr. 8-9, 14). Officer Kucharski testified that he asked Mr. King what was in his pocket, and he replied, "I don't know, check . . ." (Tr. 8). Officer Kucharski went into the jacket pocket and retrieved a bag of marijuana. (Tr. 8).

Officer Kucharski arrested Mr. King and took him to his patrol car. (Tr. 9). Officer Kucharski testified that as they were leaving, Mr. King told Ms. Cottingham not to "let them search the apartment, to get a warrant." (Tr. 10). Officer Kucharski testified that he was not present when Ms. Cottingham allegedly gave consent to search the apartment. (Tr. 15).

**B. <u>Officer David Hamrick's Testimony.</u>**

Officer Hamrick testified that he was with Officer Kucharski when they responded to a 911 call regarding a subject with a gun at Bethel Villa Apartments. (Tr. 17). Officer Hamrick testified that after knocking on the door of Apartment C1, Ms. Cottingham allowed the officers to enter the apartment. (Tr. 18). Officer Hamrick observed Mr. King come out of the bedroom. (Tr. 26). Mr. King was immediately handcuffed and patted-down. (Tr. 26). After Mr. King was handcuffed and patted-down, he was taken out of the apartment. (Tr. 26). Officer Hamrick testified that prior to being taken out of the apartment, Mr. King stated to not let the police search the apartment and for them "to get a search warrant". (Tr. 19, 27).

Officer Hamrick testified that immediately after Mr. King was taken out of the apartment, he spoke to Ms. Cottingham and got a consent to search form. (Tr. 20, 26, 27). Officer Hamrick testified that he reviewed the form with her, and she did not object to signing it, but he could not recall if she told him that he could not search the apartment. (Tr. 21, 27).

Officer Hamrick also testified that Ms. Cottingham then told him that she had marijuana in her purse, and he secured it before proceeding with his search. (Tr. 22). Officer Hamrick further testified that Ms. Cottingham stated that there no gun in the apartment, and he denied pulling out his phone and threatening to call Child Social Services if she did not consent to a search. (Tr. 27). Officer Hamrick testified that he was, instead, "talking to my sergeant at that time." (Tr. 27).

Officer Hamrick testified that he searched the first bedroom on the left because Mr. King had exited from that room, and he found a paintball gun and small revolver in the closet. (Tr. 22-23, 26, 28). Officer Hamrick testified that he showed the revolver to the alleged victim, and she identified

4

it as the gun that Mr. King had when he was at her apartment. (Tr. 23). Officer Hamrick could not recall if a third individual was in the apartment. (Tr. 26).

### C. Detective David Rosenblum's Testimony

Detective Rosenblum testified that he took a videotaped statement from Mr. King after his arrest. (Tr. 29). Agent Rosenblum testified that Mr. King told him that he was living in Apartment C1 with Ms. Cottingham and their child. (Tr. 30-31).

Detective Rosenblum also testified that he interviewed Ms. Cottingham, and that she told him that Mr. King stays at that apartment occasionally. (Tr. 31-34). Detective Rosenblum testified that he could not recall if Ms. Cottingham told him that she was facing eviction because Mr. King had been living there. (Tr. 34).

### D. Nicholas Riley's Testimony

Mr. Riley, a 24-year-old laborer, testified that he has known Mr. King for five years and was at the apartment on the night of Mr. King's arrest. (Tr. 35-36, 42). Mr. Riley testified that Mr. King had lived at the apartment for a year with Ms. Cottingham and her three kids. (Tr. 36-37, 45). Mr. Riley also testified that Mr. King and Ms. Cottingham had a six-month old baby together, and that he usually picked up Mr. King from the apartment or saw him hanging out there and visiting Ms. Cottingham. (Tr. 36-37). Mr. Riley further testified that Mr. King has keys to the apartment, and that he kept his clothes and car there. (Tr. 37).

Mr. Riley testified that on the night of Mr. King's arrest, Ms. Cottingham allowed the officers inside the apartment, and they said they wanted to speak to Mr. King. (Tr 38-39). Mr. Riley testified that the officers also said they wanted to search the apartment, but Ms. Cottingham said no. (Tr. 37,

39-40). Mr. Riley stated that he was patted down, searched and handcuffed. (Tr. 39).

Mr. Riley further testified that the officers told Ms. Cottingham she would lose her kids if she did not allow the search. (Tr. 37, 40). Mr. Riley testified that one of the officers pulled out a phone and said he would "call" if Ms. Cottingham did not allow the search. Mr. Riley testified that Ms. Cottingham signed the form as she was crying and shaking. (Tr. 40).

Mr. Riley also testified that he saw Mr. King's patdown search and the discovery of marijuana. (Tr. 43). He further stated that he heard officers tell Mr. King that they were going to take his kids. (Tr. 44).

Mr. Riley testified that he was released and later spoke to Ms. Cunningham, who told him that she only signed the consent form because the officers had threatened to take her kids if she did not consent to the search and she did not want to lose her kids. (Tr. 41). Mr. Riley also testified that Ms. Cottingham is currently facing eviction because Mr. King was living at the apartment. (Tr. 41).

### E. Sean Williams' Testimony

Sean Williams, an investigator for the Federal Public Defender's Office, testified that he spoke to Ms. Cottingham in connection with this case. (Tr. 46). Mr. Williams testified that Ms. Cottingham informed him that she was being evicted because Mr. King had lived with her in the apartment, and that her Legal Aid attorney advised her not to speak to anyone regarding Mr. King's case because it could jeopardize her eviction proceeding. (Tr. 47).

### III.   PROPOSED CONCLUSIONS OF LAW

**A.  The Police Officers Lacked Probable Cause To Enter Mr. King's Home Without A Search Warrant.**

The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." See U.S. CONST. Amend. IV. The United States Supreme Court noted that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." Terry v. Ohio, 392 U.S. 1, 9 (1968) (citing Union Pacific R.R. Co. v. Botsford, 141 U.S. 250, 251 (1891)).

"As a general rule, the Supreme Court has interpreted the Fourth Amendment's reasonableness requirement to mean that seizures and searches must be based on probable cause and executed pursuant to a search warrant." United States v. Johnson, 238 F.Supp.2d 663 (D.Del. 2002). It is well-settled law that searches and seizures conducted without a warrant are per se unreasonable, and will only be allowed if they fall within a few well-delineated exceptions. United States v. Katz, 389 U.S. 347, 357 (1967).  In the present case, the officers did not have a warrant to search the apartment, and the Government has not established, by a preponderance of the evidence, that the police search of the apartment falls under an exception to the Fourth Amendment warrant requirement.

**1.  Mr. King Had A Reasonable Expectation Of Privacy In His Home.**

The Fourth Amendment protects a reasonable expectation of privacy, and police officers are

7

required to obtain a warrant supported by probable cause to conduct a search into an area in which an individual has an expectation of privacy. See Illinois v. Rodriguez, 497 U.S. 177 (1990); Payton v. New York, 445 U.S. 573, 587 (1980) ("Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment.").

At the outset, Mr. King, who lived at 401 North Pine Street, has standing to contest the Fourth Amendment violation in this case. See Rakas v. Illinois, 439 U.S. 128, 30 n.1 (1980). "A subjective expectation of privacy is legitimate if it is 'one that society is prepared to recognize as "reasonable."'" Minnesota v. Olson, 495 U.S. 91, 95-96 (1990) (quoting Rakas, 439 U.S. at 143-44 n. 12)).

The evidentiary hearing testimony establishes that Mr. King lived at the apartment. Mr. Riley testified that Mr. King lived there for a year with Ms. Cottingham, that he had a key, and that he kept his clothes and car there. (Tr. 36-37, 45). Additionally, Mr. Riley testified that he always picked up Mr. King from the apartment. (Tr. 36-37).

Detective Rosenblum also testified that he took a videotaped statement from Mr. King after his arrest, and that Mr. King told him that he lived at the apartment with Ms. Cottingham and their child. (Tr. 29-31). Mr. King notes that although Detective Rosenblum also testified that Mr. Cottingham stated that Mr. King lived there occasionally, she did so because she was facing eviction.[1]

---

[1] During the evidentiary hearing, the Court inquired as to what inference it should draw regarding Ms. Cottingham's credibility. Mr. King submits that Ms. Cottingham's reason for being less than forthcoming regarding their living arrangement is because she and the children would face eviction. Under the terms of Ms. Cottingham's lease, Mr. King was not permitted to live at that apartment, and she now faces eviction because he lived there. Mr. Riley's testimony, as well as Mr. William's testimony, supports this fear, as well as the fact that she consented to the search of the apartment because of threats made by law enforcement officials. Ms. Cottingham was advised by her counsel not to speak about the circumstances surrounding her eviction, and this

Nevertheless, if the Court determines that Mr. King did not live at the apartment, he still had a reasonable expectation of privacy in the dwelling. In United States v. Roane, No. 07-48-GMS, 2007 WL 3171425 (D.Del. Oct. 29, 2007), the court summarized the Supreme Court's jurisprudence regarding the reasonable expectation of privacy, stating it "is clear that a person need not own or rent a property in order to have a legitimate expectation of privacy in it." Id. at *4. The court explained:

> [T]he Supreme Court has held that a person's 'status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable.' [Minnesota v. Olson], 495 U.S. at 96-97. In reaching its conclusion in Olson, the Court discussed the dynamic between an overnight houseguest and a host, noting that "[s]taying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society." Id. at 98.
>
> In Minnesota v. Carter, the Court discussed its Fourth Amendment jurisprudence and further refined its houseguest analysis. 525 U.S. 83, 89-90 (1998). Specifically, the Court discussed and distinguished the holdings in Jones v. United States, 362 U.S. 257 (1960), and Olson, noting that the overnight guest in Olson typifies "those who may claim the protection of the Fourth Amendment in the home of another," while "one merely 'legitimately on the premises,'" i.e. merely present with the consent of the householder, typifies "those who may not" claim Fourth Amendment protection.

Id. at 91.

Here, Mr. King clearly had a reasonable expectation of privacy as an overnight guest. Mr. King is Ms. Cottingham's boyfriend and the father of her youngest child, and he had a key to the apartment, as well as clothes and a car there. (Tr. 36-37).

Furthermore, it was 11:00 p.m. when the officers arrived at the apartment on the night in

---

advice should not affect her credibility.

question, and Mr. King was in the bedroom when the officers arrived. (Tr. 3, 7-8). Mr. Riley testified about Mr. King's connection to the apartment, Mr. King told officers that he lived there, and Ms. Cottingham told the officers that Mr. King occasionally stayed at the apartment. (Tr. 33). At the very least, the evidence established that Mr. King had a reasonable expectation of privacy as an overnight house guest, and, therefore, has standing to challenge the search.

### B.    The Consent to Search Was Invalidly Obtained By Law Enforcement Officials.

The Government submits that the officers had consent to search the apartment without a warrant. If the government seeks to rely upon consent to justify the lawfulness of a warrantless search, it has the burden of proving that the consent was, in fact, freely and voluntarily given. See Bumper v. North Carolina, 391 U.S. 543 (1968). Whether consent to a search was voluntary or the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).

Factors to be considered when determining the totality of the circumstances include: an individual's age, his education, his intelligence, any advice given to him about his constitutional rights, and the length and character of his detention. Id. If, under all the circumstances, it appears that the consent was not given voluntarily, but, rather, coerced by threats or force or granted only in submission to a claim of lawful authority, then the consent will be found invalid and the search unreasonable. Bumper, 391 U.S. at 548. See also, United States v. Molt, 589 F.2d 1247 (3d Cir. 1970) (holding that the consent to search by the defendant was invalid because customs Detectives misrepresented that they could obtain a warrant to search the defendant's property); United States v. Whitlock, 418 F Supp 138 (E.D. Mich. 1976), aff'd, 556 F.2d 583 (6th Cir. 1977) (holding that

consent was involuntary where Detectives threatened to arrest the defendant and his wife and take their daughter to juvenile authorities unless consent was given).

Here, police officers entered Ms. Cottingham's apartment, in which three small children were present, and asked to a search her residence. (Tr. 40). According to Mr. Riley's testimony, after refusing to consent, the officers threatened Ms. Cottingham by stating that they would call the State and have her children taken away unless she consented to a search. (Tr. 40). Indeed, one of the officer's picked up a phone and told Ms. Cottingham, "I'm calling if you don't let us search the house." (Tr. 40).

It was only after these threats were made that Ms. Cottingham consented to a search of the residence. (Tr. 40). Mr. Riley further testified that during this encounter with the officers, Ms. Cottingham was scared, shaking and crying, and that she later told him that the only reason she consented to the search was because of the officers' threat. (Tr. 41.)

Mr. Riley's testimony is contradicted only by Officer Hamrick, who testified that Ms. Cottingham was not threatened. Officer Hamrick's testimony, however, is questionable.

Officer Hamrick admitted that he pulled out his phone, but stated that he called his sergeant, and he testified that he could not recall if Ms. Cottingham did not give consent.[2]

Although Officer Kucharski remembered Mr. Riley's presence during the encounter, Officer Hamrick could not recall him, despite the fact that Mr. Riley had been handcuffed and searched. (Tr. 39.). At a minimum, Officer Hamrick's convenient forgetfulness regarding significant details about the encounter calls into question his truthfulness about the nature of Ms. Cottingham's consent.

---

[2] Officer Kucharski testified he was not present when Ms. Cottingham is alleged to have given consent and he never heard her consent to the search. (Tr. 15). Officer Santana, the other officer at the scene, was not called as a witness at the evidentiary hearing in this case.

Additionally, Mr. King objected to the search of the apartment before Ms Cottingham was forced to consent, and the police search over his objection was unreasonable and invalid. See Georgia v. Randolph, 547 U.S. 103, 121 (2006) (holding that warrantless search of shared dwelling for evidence over express refusal of consent by physically present resident cannot be justified as reasonable on basis of consent given to police by another resident). Accordingly, the officers' search of the residence was invalid, and all evidence stemming from the illegal search, including statements, must be suppressed.

## IV.  CONCLUSION

For the reasons set forth, Mr. King submits that all evidence, including statements, obtained as a result of the illegal search, must be excluded at trial.

> Respectfully submitted,
>
> */s/ Eleni Kousoulis*
> Eleni Kousoulis, Esquire
> Assistant Federal Public Defender
>
> Attorney for Defendant, Michael King

Federal Public Defender
One Customs House
704 King Street, Suite 110
Wilmington, DE 19801
(302) 573-6010
ecf_de@msn.com

Dated: June 20, 2008