IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | |
| v. | : | Criminal Action No. 08-36-JJF |
| MICHAEL D. KING, | : | |
| Defendant. | : | |

Colm F. Connolly, Esquire, United States Attorney, and Geoffrey G. Grivner, Esquire, Special Assistant United States Attorney, of the OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware.

Attorney for Plaintiff.

Eleni Kousoulis, Esquire, Assistant Federal Public Defender, of the OFFICE OF THE FEDERAL PUBLIC DEFENDER, Wilmington, Delaware.

Attorney for Defendant.

**MEMORANDUM OPINION**

August 26, 2008
Wilmington, Delaware

*Joseph J. Farnan Jr.*
Farnan, District Judge.

Pending before the Court is Defendant's Motion To Suppress Evidence And Statements (D.I. 13). For the reasons discussed the Court will deny the Motion.

I. BACKGROUND

On March 4, 2008, Defendant, Michael King, was charged by Indictment with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). On April 18, 2008, Mr. King filed a Motion To Suppress Evidence And Statements (D.I. 13) contending that the warrantless search of the apartment he occupied and the subsequent seizure of the firearm found there violated the Fourth Amendment.

On June 4, 2008, the parties appeared before the Court for a Suppression Hearing in connection with the Motion. At the hearing, Mr. King abandoned arguments based on the suppression of the statements he made after his arrest, and instead, focused on whether the search of the apartment was legal. Post-hearing briefing has been completed, and therefore, this matter is ready for the Court's decision.

II. FINDINGS OF FACTS

1. On the evening of February 12, 2008, at approximately 11:00 p.m., Officer Matthew Kucharski and other uniformed officers of the Wilmington Police Department ("WPD") responded to the Bethel Villa Apartments located at 401 North Pine Street, Wilmington, Delaware, as a result of a 911 call regarding a gun

complaint. Specifically, the caller indicated that a man with a gun was threatening her. (Tr. 4.)

2. Upon arrival at the scene, Officer Kucharski and his partner, Officer David Hamrick, encountered the victim. The victim told Officer Kucharski that she had arrived at her apartment to find Mr. King sitting on the steps smoking marijuana. (Tr. 4-5.)

3. The victim further explained that a verbal altercation ensued between her and Mr. King, during which Mr. King stated, "[M]ind your own business before I kill you." The victim then went into her apartment and closed the door. (Tr. 5.)

4. After retreating to her apartment, the victim heard a knock at her door. Leaving the security chain locked, the victim cracked the door open and saw Mr. King at the doorway. Mr. King told her, "You're going to die," and raised a large silver hand gun up to the door. (Tr. 5-6.)

5. The victim shut the door and contacted the police. As she was closing the door, she could hear Mr. King running upstairs. She reopened the door again and observed Mr. King running into Apartment C1, on the third floor. (Tr. 6.)

6. Upon hearing this information, Officer Kucharski and Officer Hamrick proceeded to Apartment C1, with the victim following closely behind. (Tr. 6.)

      7.    Officer Kucharski knocked on the door of Apartment C1. Ressa Cottingham answered the door.[1] The Officers asked if Ms. Cottingham lived in the apartment and whether her name was on the lease of the apartment. Ms. Cottingham responded in the affirmative to both questions. (Tr. 6.) The Officers asked if they could speak to Ms. Cottingham about the recent incident downstairs, and she said, "[Y]es, come in." (Tr. 7.) The Officers observed some children in the apartment, but did not immediately observe any other adults in the apartment. (Tr. 7, 26-27.) The Officers asked Ms. Cottingham if anyone else was present in the apartment. Ms. Cottingham responded that her boyfriend, Michael King, was in the apartment. (Tr. 7.)

      8.    The Officers asked if Mr. King would come out and speak about the incident, and she said she would call him. Ms. Cottingham then yelled down the hallway for Mr. King, and he exited from the first doorway on the left side of the hallway. (Tr. 7-8.) The victim, who was still standing in the hallway, observed Mr. King through the cracked open door of Apartment C1. (Tr. 8). She identified Mr. King as the individual who threatened her with the gun. (Tr. 8.)

      9.    Once identified by the victim, Mr. King was patted-down by Officer Kucharski. During the pat-down, Officer Kucharski felt what he believed to be a bag of illegal drugs in Mr. King's

---

[1] After Ms. Cottingham answered the door, Officer Santana arrived on the scene. As a result, all three officers were present and went into the apartment. (Tr. 24.)

front right jacket pocket.[2] (Tr. 9.) Officer Kucharski asked Mr. King what the object was, and Mr. King replied, "I don't know, check." (Tr. 9.) At this point, Officer Kucharski went into Mr. King's pocket and retrieved a bag of marijuana.

    10. At this point Mr. King was placed under arrest for possession of marijuana and taken to Officer Kucharski's patrol car. (Tr. 9.)

    11. Officer Kucharski testified that as they were leaving, Mr. King told Ms. Cottingham not to "let them search the apartment, to get a warrant." (Tr. 10, 27.)

    12. As Officer Kucharski was leaving with Mr. King in custody, Officer Hamrick spoke to Ms. Cottingham about the incident that occurred downstairs. It was at this time that Officer Hamrick obtained a consent to search form. (Govt. Exh. 1; Tr. 20, 27.)

    13. Officer Hamrick reviewed the consent to search form with Ms. Cottingham by reading the entire document out loud to her. Ms. Cottingham signed the document. Ms. Cottingham was not threatened and did not express any reluctance regarding her signing the document. (Tr. 21.)

---

[2] Officer Kucharski testified that he had training both at the police academy and in the field concerning what a bag of drugs feels like through clothing. He suspected what he felt might be illegal drugs, because he felt what seemed to be a plastic sandwich bag with a hard knot at the end of it. (Tr. 9.)

    14.    After signing the consent to search form, Ms. Cottingham advised Officer Hamrick that she had marijuana in her purse, which was located on the counter. The marijuana was retrieved and secured by Officer Hamrick. (Tr. 22.)

    15.    Officer Hamrick proceeded with the search by going down the hallway to the first bedroom on the left, which was the bedroom Mr. King had exited from. Officer Hamrick noted that the bedroom did not appear to be a man's bedroom. The bedroom appeared to be a woman's bedroom and was quite messy with clothes and shoes lying around. (Tr. 22.)

    16.    Once in the bedroom, Officer Hamrick searched the closet area. He found a small black paint ball gun located on top of a cardboard box. (Tr. 23.)

    17.    After securing the paint ball gun, Officer Hamrick looked in the closet again and found a small silver revolver. (Tr. 23.)

    18.    Officer Hamrick removed the revolver from the closet and showed it to the victim, who was still in the hallway. The victim identified the revolver as the gun that Mr. King brandished while threatening her. (Tr. 23-24.)

    19.    After Mr. King's arrest, Officer David Rosenblum took a statement from Mr. King. Mr. King informed Officer Rosenblum that he was living in the apartment with Ms. Cottingham, but he also discussed another address, as well. (Tr. 29-31.)

20. Officer Rosenblum also interviewed Ms. Cottingham. Ms. Cottingham told Officer Rosenblum that Mr. King did not live in the apartment and only stayed there occasionally. (Tr. 32, 33.)

21. At the hearing, Nicholas Riley, a friend of Mr. King for the last five years, also testified for the defense. (Tr. 36.) Mr. Riley testified that Mr. King lived with Ms. Cottingham in the apartment and had keys and clothes there. (Tr. 37.)

22. Mr. Riley testified that the door to the apartment automatically closes, that a woman was not standing in the hallway, and that Ms. Cottingham refused to give the Officers permission to search the apartment until they threatened to call Social Services and have her children taken away from her. Mr. Riley testified that Ms. Cottingham was scared, crying and shaking when the Officers were at the apartment and that she later told him that she only signed the consent form because she was afraid the Officers would carry out their threat of taking away her children. (Tr. 37-40.)

23. In addition, Sean Williams, an investigator for the Federal Public Defender's office testified for the defense at the hearing. Mr. Williams testified that he interviewed Ms. Cottingham who informed him that she was being evicted from her apartment, because people were saying that Mr. King was living with her in the apartment. However, Mr. Williams conceded that Ms. Cottingham did not tell him that Mr. King was in fact living there. (Tr. 46-48.)

24. Ms. Cottingham did not appear at the suppression hearing because she is being represented by counsel in eviction proceedings and was told not to speak about the incident. (Tr. 47.)

III. CONCLUSIONS OF LAW

1. The Fourth Amendment to the United States Constitution protects "the right of the people to be secure against unreasonable searches and seizures. . . ." U.S. Const. Amend. IV.

2. Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause, unless it falls under an exception to the warrant requirement. Evidence derived from an illegal search may not be used at trial and is considered "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 487-88 (1963).

3. In the case of a warrantless search, "the burden is on the Government to demonstrate by a preponderance of the evidence that the search was conducted pursuant to one of the exceptions to the warrant requirement." See e.g., United States v. Herrold, 962 F.2d 1131, 1137 (3d Cir. 1992).

4. If voluntary consent is obtained from the individual whose property is to be searched or a third party with common authority or joint control over the premises, the Government may search the premises without a warrant.

5. A party challenging the legality of a warrantless search must have standing. United States v. Padilla, 508 U.S. 77, 81-82 (1993). To establish standing, the party contesting the legality of the search bears the threshold burden of establishing that he or she had a reasonable expectation of privacy in the property searched and the item seized. Minnesota v. Olson, 495 U.S. 91, 96-97 (1990); Minnesota v. Carter, 525 U.S. 83 (1998).

6. A co-resident of a shared dwelling and an overnight guest of a dwelling are typically held to have a reasonable expectation of privacy in that dwelling. See e.g., Olson, 495 U.S. at 110; U.S. v. Villegas, 495 F.3d 761, 772 (7th Cir. 2007).

7. In this case, Mr. King principally offers the testimony of Nicholas Riley to establish his status as a co-resident of the apartment for purposes of establishing standing to contest the legality of the search. Mr. Riley testified that he is a friend of Mr. King, who has known him for the past five years. (Tr. 36:1-5.) Mr. Riley testified that Mr. King lived in the apartment with Ms. Cottingham and her three children, and that he was living there on the night of the search, February 12, 2008. (Tr. 12-21.) When asked to provide an explanation as to how he knew Mr. King was living at the residence, Mr. Riley replied, "I usually pick him up. I see him hanging out and visiting with her. I would go over and call." (Tr. 36:22-24.) Mr. Riley further testified that Mr. King had clothes and a car at the

apartment, and that he had the keys to the apartment. Mr. Riley also testified that Mr. King was the father of Ms. Cottingham's six-month old child and that Mr. King had probably lived in the apartment for about a year because he was living there prior to the birth of the child. (Tr. 36:25-37:8).

    8. Based on the evidence and testimony adduced at the hearing, the Court concludes that Mr. King has not established that he had a reasonable expectation of privacy in Ms. Cottingham's residence as either a co-resident or an overnight guest. In reaching this conclusion, the Court does not accept as credible the testimony of Mr. Riley, and therefore, does not accept his affirmative assertions on direct examination that Mr. King was residing at the apartment on the day in question. Mr. Riley testified that he was with Mr. King throughout the day, but he was not with him when he ran from downstairs to Ms. Cottingham's apartment upstairs. However, Mr. Riley testified that he was present when the Officers entered Ms. Cottingham's apartment. Mr. Riley's version of the events that transpired after the marijuana was found in Mr. King's pocket differs from the testimony of the Officers, and the Court credits the testimony of Officers Kucharski and Hamrick. For example, Mr. Riley testified that there was a twenty minute gap between the time the Officers found the marijuana and the time they took Mr. King out of the apartment. During this twenty minute gap, Mr. Riley testified that the Officers were threatening Ms. Cottingham

saying that they would take her kids away from her, and yet, Mr. King "was standing, just standing there, looking." (Tr. 44:13-14.) This testimony is not only inconsistent with the Officers' testimony, but it is also inconsistent with the position advanced by Mr. King in his Motion, i.e. that Mr. King was expressing his lack of consent to the search by telling Ms. Cottingham not to provide the Officers with consent to search the premises. (Tr. 10, 19.)

    9.    In addition to this fundamental inconsistency between Mr. Riley's testimony and the Officers' testimony concerning Mr. King's behavior and his statements to Ms. Cottingham, the Court also finds Mr. Riley's credibility affected by other contradictions in his testimony. For example, Mr. Riley testified on direct examination that Ms. Cottingham called him crying at about 1 or 2 o'clock in the morning after the search (Tr. 41:7-8), but on cross-examination, he testified that he called Ms. Cottingham. (Tr. 45:24-25). In addition, Mr. Riley used words like "hanging around" and "visiting" to describe Mr. King's presence at the apartment. (Tr. 36:23-24.) In the Court's view, these words are inconsistent with the premise that Mr. King lived at the apartment. Indeed, a resident would not merely be "hanging out" and "visiting" with Ms. Cottingham, he would be living with her in the apartment on a consistent and regular basis.

10.   Mr. Riley's testimony is also inconsistent with Ms. Cottingham's lease which apparently prohibits Mr. King's full or part-time residence at the apartment, and with Detective Rosenblum's testimony concerning his interview with Ms. Cottingham.  During his interview with Ms. Cottingham, she stated that Mr. King did not live in the apartment and only stayed there occasionally.

11.   Mr. King also offers as evidence his tape recorded statement that he lived in the apartment with Ms. Cottingham.  The Court also does not accept Mr. King's self-serving statement as credible.  Like Mr. Riley's testimony, Mr. King's statement contradicts the statement provided by Ms. Cottingham during her interview with Detective Rosenblum.  In addition, the fact that Mr. King was telling Ms. Cottingham not to give the Officers consent to search the apartment demonstrates that even Mr. King believed that Ms. Cottingham was the only person with the authority to make a decision with respect to consent to search the premises.  Notably, Mr. King never expressed to the Officers that he did not consent to the search.  At most, Mr. King was trying to persuade Ms. Cottingham not to exercise her authority to consent.[3]

---

[3]   As the Court has noted, Mr. Riley who was allegedly present during this time, didn't even confirm that Mr. King was instructing Ms. Cottingham not to consent.  Rather, it was the Officers who provided to the Court the testimony concerning Mr. King's statements to Ms. Cottingham, a fact which further diminishes Mr. Riley's credibility.

12. In sum, the Court concludes that Mr. King has failed to adduce sufficient evidence to establish that he was a co-resident of the apartment at the time of the search. In addition, the Court also concludes that Mr. King's occasional presence at the apartment is insufficient to establish that Mr. King was an overnight guest at Ms. Cottingham's residence on the night in question. Other than the testimony of Mr. Riley, which the Court has declined to accept, there is no evidence that Mr. King had clothes, belongings or any overnight bags in the apartment. Officer Hamrick testified that the bedroom he searched appeared to be a woman's room, and the record is void of any indication as to whether the clothes and shoes strewn about belonged to a male, let along that they belonged to Mr. King specifically.

13. Based on the foregoing, the Court concludes that Mr. King has not established that he had a reasonable expectation of privacy in Ms. Cottingham's residence on the night in question. See Carter, 525 U.S. at 473 (recognizing that while an overnight guest may claim Fourth Amendment protections, "one who is merely present with the consent of the householder may not"). Accordingly, the Court concludes that Mr. King lacks standing to assert a Fourth Amendment challenge to the search of Ms. Cottingham's residence.

14. Having concluded that Mr. King lacks standing to challenge the search of the apartment, the Court need not address the issue of whether Ms. Cottingham's consent to search was

voluntary. Ms. Cottingham did not appear at the hearing and has not challenged the validity of her consent to the search. <u>U.S. v. Salvucci</u>, 448 U.S. 83, 85 (1980) (holding that "defendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have in fact been violated").

IV.  **CONCLUSION**

For the reasons discussed, the Court will deny Mr. King's Motion To Suppress Evidence And Statements.

An appropriate Order will be entered.